**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROSEMONT TAXICAB CO., INC and GERMANTOWN CAB COMPANY, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 16-3601 |
| | : | |
| THE PHILADELPHIA PARKING AUTHORITY, WILLIAM SCHMID, and STEVEN MARSHALL, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

**Padova, J.**                                                    **June 26, 2018**

The Philadelphia Parking Authority ("PPA") through its Taxi and Limousine Division ("TLD") routinely seizes without a warrant vehicles that are suspected of being used as taxicabs that do not have a PPA inspection sticker. Plaintiffs Rosemont Taxicab Co., Inc. ("Rosemont") and Germantown Cab Company ("GCC") filed this lawsuit alleging that the PPA's practice violates their rights under the Fourth and Fourteenth Amendments of the United States Constitution and parallel provisions of the Pennsylvania Constitution (Counts I and II). They also seek declaratory relief that a Pennsylvania statute and the PPA implementing regulations permitting warrantless seizures of taxicabs are unconstitutional "as applied" (Count III). Finally, GCC alleges state law claims for conversion (Count IV), trespass to chattels (Count V), and fraud (Count VI). Presently pending are the parties' cross motions for summary judgment based on a stipulation of facts ("Stip.").[1] We conclude that the PPA's warrantless seizure of Plaintiffs'

---

[1] The parties have submitted a Joint Consolidated Appendix ("J.App."), which has been cross-filed in this action and <u>Germantown Cab Company v. The Philadelphia Parking Authority,</u>

vehicles is prima facie unconstitutional, and the absence of pre-deprivation procedures denied Plaintiffs due process of law. We also conclude that Defendants have failed to meet their summary judgment burden to show they are entitled to their proffered affirmative defenses on Plaintiffs' constitutional claims. Finally, we conclude that, while Plaintiffs have demonstrated that there are no genuine issues of material fact and they are entitled to judgment as a matter of law on their constitutional claims, GCC cannot demonstrate the elements of its state law claims as a matter of law. Accordingly, with limited exceptions to be discussed later, we grant Plaintiffs' Motion on liability issues on Counts I, II, and III and deny Defendants' Motion on those Counts; we grant Defendants' Motion for summary judgment with regard to Counts IV, V, and VI.

## I.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is not genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record that] it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court [ ] that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the nonmoving party has the burden of

---

et al., Civ. No. 14-4686. Defendants also have submitted a separate appendix ("D.App."). Each side has also filed a separate statement of allegedly undisputed facts ("DSOF"; "PSOF").

identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). That is, summary judgment is appropriate if the nonmoving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"In evaluating the evidence, we take the facts in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in [their] favor." Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003) (internal quotation omitted). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

## II.  SUMMARY JUDGMENT RECORD

GCC is a taxicab operator that holds a certificate of public convenience ("CPC") issued by the Pennsylvania Public Utility Commission ("PUC") authorizing it to provide taxicab service in parts of the City of Philadelphia and Montgomery County, Pennsylvania. (Stip. ¶ 1.) Rosemont is a taxicab operator that holds a CPC issued by the PUC authorizing it to provide call or demand taxicab service in parts of Delaware County and Montgomery County, Pennsylvania. (Id. ¶ 5.) Both companies generate revenue by leasing taxicabs to drivers. (Id. ¶ 4.) GCC's CPC provides for limited or "partial" operating rights within Philadelphia; it does not authorize "city wide"

rights.  (Id. ¶ 2.)  Only taxicabs with medallions issued by the PPA are authorized to provide citywide service in Philadelphia.  (Id. ¶ 3.)

Prior to 2004, the PUC was solely responsible for the regulation of taxicab and limousine operations throughout Pennsylvania.  (Id. ¶ 6.)  In Act 94 of 2004, 53 Pa. Cons. Stat. §§ 5701-5725 ("Act 94"), the Pennsylvania General Assembly transferred the regulatory responsibility over taxicab and limousine operations within Philadelphia from the PUC to the PPA.  (Id. ¶¶ 7, 9.) The PUC retained jurisdiction over all other taxicab and limousine services provided outside of Philadelphia.  (Id. ¶ 8.)  The PPA regulates the Philadelphia taxicab industry through the TLD. (Id. ¶ 9.)  TLD's Enforcement Division is responsible for enforcing the PPA's regulations and governing statute.  (Id. ¶ 11.)  At all relevant times, Defendant William Schmid ("Schmid") has been TLD's Manager of Enforcement and, in 2013, became TLD's Deputy Director.  (Id. ¶¶ 12-13.)  Defendant Steven Marshall ("Marshall") is a TLD Enforcement Officer who reports to Schmid.  (Id. ¶¶ 14-15.)

When the PPA assumed responsibility for regulating the Philadelphia taxicab industry in or about 2005, Section 5714 of Act 94, 53 Pa. Cons. Stat. § 5714 (superseded) ("Section 5714"), set forth the PPA's authority to impound taxicab vehicles.  (Stip. ¶ 16.)  Section 5714 did not require the PPA to impound vehicles when violations were discovered; neither did it require the PPA to obtain a warrant before impounding a vehicle.  (Id. ¶¶ 17-18.)  At that time, the PPA interpreted and applied Section 5714 as authorizing it to impound without a warrant any non-medallion vehicle found to be providing "hail service" in Philadelphia without legal authority to do so, including licensed taxicabs operating under valid CPCs issued by the PUC, such as those operated by Plaintiffs.  (Id. ¶ 19.)

After having taxicabs seized without warrant under Section 5714, Plaintiffs, along with Sawink, Inc. (another taxicab company), filed suit in the Commonwealth Court of Pennsylvania, docketed at Sawink, Inc., v. PPA, No. 84 M.D. 201 (2011) ("Sawink"), challenging the constitutionality of the PPA's impoundment of their vehicles. (Stip. ¶ 20.) On January 6, 2012, the Commonwealth Court issued a decision in favor of the petitioners in Sawink, concluding that Section 5714 "does not authorize the impoundment sanction where a taxicab, certificated by the PUC, accepts a hail in Philadelphia," a decision that was ultimately affirmed by the Pennsylvania Supreme Court. Sawink, Inc. v. PPA, 34 A.3d 926, 932 (Pa. Commw. Ct.), aff'd, 57 A.3d 644 (Pa. 2012). In the aftermath of Sawink, the PPA has only seized private "hacks" — vehicles providing unlawful taxicab service in Philadelphia — as well as vehicles providing Uber or Lyft service prior to the Legislature's legalization of those services in Philadelphia in November, 2016. (Stip. ¶ 22.) The PPA has not impounded any taxicab vehicle operating under a valid CPC issued by either the PPA or the PUC merely for operating outside of its territorial rights. (Id.)

On July 6, 2012, the Pennsylvania Legislature adopted Act 119 of 2012, which modified the relevant language of Section 5714 ("Act 119") following the Sawink decision. (Id. ¶ 23.) Like its predecessor, Section 5714 as amended by Act 119 (the "Current Impoundment Statute"), does not require the PPA to obtain a warrant before impounding a vehicle.[2] (Id. ¶ 25.) Although

---

[2] Paragraph (g)(1) of § 5714 currently provides that the PPA:

is empowered to confiscate and impound vehicles, medallions and equipment which are utilized to provide call or demand service in cities of the first class without a proper certificate of public convenience issued by [the PPA] or which are in violation of regulations of [the PPA]. Upon satisfaction of all penalties imposed and all outstanding fines assessed against the owner or operator of the confiscated vehicle and payment of the costs of [the PPA] associated with confiscation and impoundment, the vehicle, medallion and equipment shall be returned to its registered owner or registered lienholder.

empowered to do so, the Current Impoundment Statute likewise does not require the PPA to impound any vehicles. (Id. ¶ 26.) Vehicles impounded under the Current Impoundment Statute are not subject to civil forfeiture. (Id. ¶ 27.)

In 2014, following the Legislature's adoption of the Current Impoundment Statute, the PPA promulgated new regulations, approved by the PPA's Board on March 13, 2014 and codified at 52 Pa. Code §§ 1017.51 and 1017.52 (the "Current Impoundment Regulations"), setting forth the circumstances under which it would impound vehicles and establishing a procedure for such impoundments.[3] (Stip. ¶¶ 28-30.) The Current Impoundment Regulations define five circumstances as an "impoundable offense." See 52 Pa. Code § 1017.51. One of the "impoundable offenses" occurs when "[a]n unauthorized taxicab provides, or attempts to provide, call or demand service [i.e. taxicab] in Philadelphia." (Stip. ¶ 32 (bracket in original).) An "unauthorized taxicab" is defined as "[a] vehicle without a current and valid TLD inspection sticker. . . ." (Id. ¶ 33.) Like the Current Impoundment Statute, the Current Impoundment Regulations also do not require the PPA to obtain a warrant before impounding a vehicle for an impoundable offense. (Id. ¶ 34.)

Dennis Weldon, the PPA's General Counsel, was involved in the rule-making process for the Current Impoundment Regulations. (Id. ¶ 35.) Because it is not permitted by the statute, the Current Impoundment Regulations do not allow civil forfeiture of an impounded vehicle. (Id. ¶ 36.) Since the Current Impoundment Regulations became effective, Defendant Schmid has

---

53 Pa. Cons. Stat. § 5714(g)(1).

[3] The Current Impoundment Regulations became effective after approval by the Independent Regulatory Review Commission ("IRRC") and publication in the Pennsylvania Bulletin on June 21, 2014. The IRRC approved the Current Impoundment Regulations over extensive objections made in public comments by GCC and Plaintiffs' counsel, including the same constitutional arguments raised in this case. (DSOF ¶ 1; D.App. at Tabs 2-4.)

maintained a policy of requiring TLD Enforcement Officers to obtain his approval before proceeding with any impoundment under the Current Impoundment Regulations. (Id. ¶ 38; DSOF ¶ 2; J.App. Tab Q (August 18, 2017 Dep. of William Schmid ("Schmid Dep.")) at 292-294, 330.)

The PPA has a written procedure entitled "Impoundment of Vehicle Equipment" that is issued to all Enforcement Officers. (DSOF ¶ 3; D.App. Tab 5; Schmid Dep. at 311-312.) The procedures applicable to the PPA's impoundment of vehicles under the Current Impoundment Regulations are set forth at 52 Pa. Code § 1017.52. (Stip. ¶ 40.) The Current Impoundment Regulations do not provide for pre-deprivation notice or a hearing prior to impounding a vehicle. (Id. ¶ 41.) The Current Impoundment Regulations only provide for post-deprivation notice and a hearing after an impoundment occurs. (Id. ¶ 42.)

The PUC subjects Plaintiffs' vehicles to a number of regulations concerning equipment standards and inspections. See 52 Pa. Code §§ 29.401-29.407. The PUC requires that Plaintiffs' vehicles comply with the Pennsylvania Department of Transportation ("PennDOT") Vehicle and Equipment Inspection standards. (Stip. ¶ 44.) None of Plaintiffs' vehicles at issue in this Litigation had been placed out of service by the PUC at the time of their impoundment by the PPA. (Dec. 28, 2017 Decl. of Joseph Gabbay ¶ 8; Dec. 26, 2017 Decl. of Rachel Tiffany Gabbay-Karsenty ¶ 8.) On July 30, 2014, just two days before being impounded by the PPA, the PUC inspected GCC taxicab G91 for safety and the vehicle passed the inspection. (Pl. Ex. I (GCC's 2014 Annual Inspection Report).) The PUC also safety inspected and passed G35 on that date, approximately five weeks before that vehicle was impounded by the PPA for lacking a safety inspection sticker. (Id.)

The PPA's first impoundment of a vehicle operated by GCC or Rosemont under the Current Impoundment Statute and Regulations occurred on August 1, 2014. (Stip. ¶ 39.) On that

date, the PPA stopped and cited G91 for allegedly providing illegal service by picking up a "hail fare" in Philadelphia. (Id. ¶¶ 39, 45.) An additional citation was also issued to the driver of G91 for operating without a valid driver certificate. (D.App. Tab 24 (N.T. Aug. 7, 2014 Impoundment Hrg.) at 6-7.) The PPA immediately seized G91 because it lacked a valid PPA inspection sticker, even though it had been inspected two days earlier by the PUC. (Stip. ¶ 46; Pl. Ex. I.) The PPA did not have a warrant for this seizure and did not provide GCC with pre-deprivation notice or an opportunity to be heard prior to seizing the vehicle. (Stip. ¶¶ 47-48.) On August 6, 2014, GCC requested a post-deprivation hearing, and an impoundment hearing was held the next day. (Id. ¶¶ 49-50.) On September 3, 2014, the hearing officer entered an order finding the impoundment to be proper and set bond for the release of the vehicle at $1,000. (Id. ¶ 51.)

GCC appealed from the Hearing Officer's order to the Philadelphia Court of Common Pleas.[4] (Id. ¶ 52.) On May 14, 2015, Common Pleas Judge Nina Wright Padilla denied GCC's appeal. (Id. ¶ 53.) GCC then appealed to the Pennsylvania Commonwealth Court. (Id. ¶ 54.) In connection with GCC's appeal to Commonwealth Court, Judge Padilla issued an Opinion dated July 30, 2015. (Id. ¶ 55.) On March 1, 2016, the Commonwealth Court issued a decision denying GCC's appeal, Germantown Cab Co. v. Philadelphia Parking Authority, 134 A.3d 1115 (Pa. Commw. Ct. 2016), *alloc. denied*, 160 A.3d 774 (Pa. 2016) (the "GCC Direct Appeal Opinion"), and GCC filed a petition for allocatur to the Pennsylvania Supreme Court. (Stip. ¶¶ 56-57.) On November 1, 2016, the Supreme Court of Pennsylvania denied GCC's petition for allocatur. (Id. ¶ 59.) Following that decision, the PPA abated storage fees and released G91 to

---

[4] The administrative proceedings and subsequent judicial appeals of the citation issued to GCC for G91 are referred to collectively by the parties as "the State Court Impoundment Action."

GCC upon payment of $1,500. (Id. ¶ 60.) The PPA did not require GCC to obtain a current and valid PPA inspection sticker before releasing G91 back to GCC. (Id. ¶ 61.)

The PPA has also stopped, cited, and seized without warrants GCC taxicabs G35 (Stip. ¶¶ 62-67), G9 (id. ¶¶ 68-74), and G12[5] (id. ¶¶ 87-93) and Rosemont taxicabs R30 (id. ¶¶ 75-80) and R34[6] (id. ¶¶ 81-86.) In each instance, the Plaintiff owner of the taxicab received no pre-deprivation notice and hearing, and the vehicle was released after the owner paid the citation with no requirement that the vehicle be safety inspected before being placed back in service. (Id. ¶¶ 62-93.)

On or about January 10, 2012, at the direction of Defendant Schmid, Defendant Marshall applied to work as a taxicab driver for GCC. (Stip. ¶ 94.) At Schmid's instruction, Marshall did not to identify himself to GCC as a PPA Enforcement Officer and did not wear any clothing that would indicate that he was a PPA employee. (Id. ¶ 95-97.) Marshall filled out an application to become a taxi driver at GCC using his real name, real contact information, real social security

---

[5] G12 was stopped on May 5, 2016, after it was observed in the area of City Hall. (Stip. ¶ 87.) The parties stipulate that there was no passenger in the taxicab at the time it was stopped by the PPA, and the driver told the TLD Enforcement Officers that she was providing paratransit service, which is not regulated by the PPA. (Id. ¶¶ 88-89.) GCC is authorized by the PUC to provide paratransit work in Pennsylvania. (Pl. Ex. J (Germantown Paratransit Tariff).) The PPA does not regulate paratransit services. (Schmid Dep. at 424:21-425:10.) The PPA released the vehicle on the same day it was seized, rescinded any citations in connection with the incident, and agreed to reimburse any related towing fees. (Stip. ¶ 93.) Although the citations were rescinded, Defendants nonetheless assert here that the driver could produce no log to corroborate her claim that she was providing paratransit service, the Enforcement Officer observed an unauthorized meter in the vehicle, and the vehicle had a broken side mirror and inoperable driver side window. (D.App. Tab 22; Schmid Dep. at 360- 67.) For the reasons discussed below, we conclude that the PPA's assertions are immaterial to our analysis of whether the warrantless seizure of G12 was constitutional.

[6] The PPA also cited Rosemont in connection with the stop of R34 on February 26, 2016, because the driver was operating the vehicle with a suspended driver's license and without proof of registration or insurance. (D.App. Tabs 19-21; Schmid Dep. at 347-51.) The PPA withdrew the citation for operating a vehicle with a suspended driver's license. (D.App. Tab 20.)

card and real driver's license.  (Id. ¶ 98.)  Marshall visited GCC several times through February 3, 2012, including attendance at a training class conducted by GCC during which Marshall and other attendees were instructed how to fabricate trip logs to conceal illegal operations and were advised that the PUC, rather than the PPA, properly regulates GCC's operations.  (Id. ¶ 99; D.App. Tab 29; J.App. Tab K (Sept. 22, 2016 Deposition of Steven Marshall ("Marshall Dep.")) at 348-75.)

After being approved as a taxicab driver by GCC, on February 4, 2012 Marshall made arrangements to work a shift operating GCC taxicab G61 and made the lease payment required by GCC to lease the vehicle for one day.  (Stip. ¶ 100.)  However, Marshall had no intention of ever driving G61 as a taxicab-for-hire during his shift and did not engage in any business as a taxicab driver.  (Id. ¶¶ 101-02.)  Instead, Marshall drove G61 to the PPA's garage at 2415 South Swanson Street in Philadelphia, where the car was inspected by a PPA mechanic.  (Id. ¶ 103.)  Schmid was present during the inspection.  (Id. ¶ 104.)  The inspection revealed multiple problems, including a non-functional airbag, a leaking break line and pinion gear, and a hole in the trunk.  (D.App. Tab 29; Marshall Dep. at 348-75.)  No one from GCC was notified about, or present during, the PPA's inspection of G61.  (Stip. ¶ 105.)  Marshall timely returned the taxicab to GCC.  (Id. ¶ 106.)  When he returned the vehicle, he represented to GCC that the PPA stopped him at 30th Street Station to inspect the vehicle.  (Stip. ¶ 107.)  The PPA did not issue any citations to GCC relating to any aspect of Marshall's activities or the inspection of G61.  (Id. ¶ 108.)  GCC was not aware of the Marshall undercover operation prior to conducting discovery in other litigation with the PPA pending before this Court.  (Id. ¶ 109.)

## IV.    DISCUSSION

### A.    Claim Preclusion and Issue Preclusion

Defendants argue that Plaintiffs' constitutional claims are barred on both claim preclusion

and issue preclusion grounds because the claims were raised or could have been raised in earlier

litigation involving the parties.  Citing the proceedings in the State Court Impoundment Action,

they argue that Plaintiffs should not be permitted to relitigate the constitutionality of the Current

Impoundment Statute and Regulations.[7]

---

[7]    The summary judgment record reflects that during an administrative hearing held on August 7, 2014 in the State Court Impoundment Action, GCC's counsel argued that the PPA "cannot impound a vehicle because it violates the Constitution," and referenced both due process and equal protection rights.  (D.App. Tab 24 at 41, 45-46.)  The summary judgment record further shows that, following the close of testimony, counsel argued:

> They cannot impound a vehicle because it violates the Constitution, first of all, and, secondly, because they don't have the statutory authority to do so.
>                                     . . .
> The other issue that underlies all this is that just because a statute authorizes an impoundment of vehicles doesn't mean that a [sic] claims can't be made against it.  That's invalid for constitutional reasons, and there are due process reasons and there are equal protection reasons in this particular case why the impoundment statute is invalid.  I know you can't rule on the constitutionality of the statute, but we're preserving that issue for appeal.

(D.App Tab 20 (N.T. Aug. 7, 2014) at 41, 45-46.)  In its subsequent appeal from the hearing officer's Order upholding the August 1, 2014 citation, GCC argued to Judge Padilla, inter alia, that the TLD impoundment of Plaintiff's taxicab without a warrant under the Current Impoundment Regulations was unconstitutional.    (D.App. Tab 26 at 17-20 (citing Pa. Constitution Art. 1, Sect. 8; S. Dakota v. Opperman, 428 U.S. 364 (1976).)

In her decision, Judge Padilla held that "Appellant did not challenge the constitutionality of the Code before the hearing officer, and thus has waived any challenge before this Court." (D.App. Tab 28 at 10.)  In GCC's brief filed in connection with its subsequent appeal from the Court of Common Pleas to the Commonwealth Court, it raised the same arguments, including a challenge to the constitutionality of the Current Impoundment Regulations.  (D.App. Tab 32 at 25 ("The Authority's interpretation of the statue [sic] also raises constitutional concerns. Warrantless seizures of property by the government are a serious concern for every citizen because they implicate important constitutional protections."); id. at 25-29 (invoking Pennsylvania Const. Art. I, sect. 8, and "United States Constitution" to argue Defendants exceeded their authority to impound taxicabs under the "community caretaking function").)  The

### 1. Claim Preclusion

Claim preclusion or res judicata "is designed to avoid piecemeal litigation of claims arising from the same events." General Elec. Co. v. Deutz AG, 270 F.3d 144, 157-58 (3d Cir. 2001); see also Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2305 (2016), as revised (June 27, 2016) (stating that claim preclusion prohibits "'successive litigation of the very same claim' by the same parties" (quoting New Hampshire v. Maine, 532 U.S. 742, 748 (2001))).  It generally bars the relitigation of a cause of action where there has been a "final judgment on the merits in a prior suit involving the same parties or their privies and a subsequent suit based on the same cause of action." General Elec. Co., 270 F.3d at 158.  Claim preclusion is "based on concerns of fairness, on reliance on the finality of prior judicial determinations, and on the expectation of not having to conform primary conduct to inconsistent decisions and inconsistent legal obligations." Bell Atl.-Pennsylvania, Inc. v. Pennsylvania Pub. Util. Comm'n, 273 F.3d 337, 345 (3d Cir. 2001) (citing E.E.O.C. v. U.S. Steel Corp., 921 F.2d 489, 492 (3d Cir. 1990)).  Importantly, claim preclusion applies both to claims that "were or could have been raised" in a prior action involving the "parties or their privies." Allen v. McCurry, 449 U.S. 90, 94 (1980) (citations omitted).  "Claim preclusion thus bars relitigation of any claim that *could have* been raised in the prior action even if it was not so raised." In re Graham, 973 F.2d 1089, 1093 (3d Cir. 1992) (emphasis added).

---

Commonwealth Court also held that the issue was not preserved. Germantown Cab Co. v. Philadelphia. Parking Auth., 134 A.3d 1115, 1122 (Pa. Commw. Ct. 2016) (the "GCC Direct Appeal Opinion") ("Germantown's argument that the Authority's impoundment of its taxicab violated Germantown's rights under the Fourteenth Amendment of the U.S. Constitution is waived for failure to raise it before the Authority's hearing officer.  Assuming Germantown raised a constitutional challenge that was not waived, Germantown has not met its burden in proving that the Act and/or the Authority's regulations are unconstitutional.")

In applying the principles of claim preclusion, "we must give the same preclusive effect to the [state court] judgment . . . that the courts in Pennsylvania, the state in which the judgment was entered, would give." Turner v. Crawford Square Apartments III, L.P., 449 F.3d 542, 548 (3d Cir. 2006) (citing Lance v. Dennis, 546 U.S. 459, 466 (2006)). In Pennsylvania, claim preclusion requires that the current action and the prior action share the following four "identities": "(1) the thing sued upon or for; (2) the cause of action; (3) the persons and parties to the action; and (4) the capacity of the parties to sue or be sued." Id. (citing Bearoff v. Bearoff Bros., Inc., 327 A.2d 72, 74 (Pa. 1974)). In Pennsylvania, "the mere advancement of a different legal theory does not necessarily give rise to a different cause of action." Turner, 449 F.3d at 548 (citation omitted); Hopewell Estates, Inc. v. Kent, 646 A.2d 1192, 1194-95 (Pa. Super. Ct. 1994) (noting that courts consider "whether both actions seek compensation for the same damages" in determining whether claim preclusion applies); but see McArdle v. Tronetti, 627 A.2d 1219, 1222-23 (Pa. Super. Ct. 1993) (finding a lack of identity between two sets of claims — federal constitutional violations and state law gross negligence — because they involved distinct factual allegations and elements).

Defendants argue that claim preclusion

> unquestionably applies to Germantown, which actually raised the same constitutional claims in the State Court Impoundment Action in the context of one of the same impoundments raised here: the impoundment of G-91 on August 1, 2014 (the first impoundment under the Current Impoundment Statute and Regulations). The Commonwealth Court's decision rejecting those claims is a final judgment, as the Supreme Court of Pennsylvania declined review.

(Def. Mem. at 27 (emphasis omitted).) They argue that claim preclusion applies to Rosemont as well because, "prior to commencing this action, Rosemont pled liable to TLD's citations and paid all corresponding fines and charges in connection with the impoundments of R-30" and [u]nder Pennsylvania law, a plea qualifies as a final judgment on the merits for purposes of res judicata analysis." (Id. at 28 (citing Moyer v. Allstate Ins. Co., Civ. A. No. 09-1290, 2010 WL 3328035,

at *6 (M.D. Pa. Aug. 20, 2010) (holding that husband-insured's guilty plea to arson precluded both his and his wife's collection of fire insurance proceeds since (1) the wife was also an "insured person" under the policy; (2) the guilty plea was admissible in the civil action as an admission against interest; (3) the issue in criminal case was identical to the issue in coverage action; and (4) the guilty plea was conclusive of whether husband intended the result of his actions); DiJoseph v. Vuotto, 968 F. Supp. 244, 247 (E.D. Pa. 1997) ("Operative facts necessary for criminal convictions are admissible as conclusive facts in civil suits arising from the same events and circumstances." (citing Folino v. Young, 568 A.2d 171, 172 (Pa. 1990))).) Because the Commonwealth Court's decision rejecting Plaintiffs' challenge to the impoundment of their taxicabs is a final judgment, Defendants assert that the claims raised here are precluded.

We find that claims preclusion does not apply to bar Plaintiffs' constitutional claims because there is no identity of the cause of action. The PPA hearing officer and the state courts that heard GCC's appeals were focused upon **Plaintiffs'** conduct in operating its taxicabs without PPA inspection stickers, while the constitutional claims GCC and Rosemont raise here focus on **Defendants'** conduct in conducting warrantless seizures of taxicabs found to lack inspection stickers. Moreover, this is clearly not an attempt at seriatim litigation of nearly identical claims. Whether or not GCC attempted to raise an affirmative defense in the State Court Impoundment Action, it could not have received the type of relief it and Rosemont seek here, namely an injunction and money damages arising from the unconstitutional seizure. Thus, the "same" constitutional claims could not have been raised in the State Court Impoundment Action.[8] Finally, there is no identity between the elements needed to be proved in that action and the

---

[8] For the same reason, Plaintiffs' decisions to plead liable to other violations before hearing officers, rather than contesting citations, cannot preclude their constitutional claims.

elements Plaintiffs must prove to establish warrantless seizure and due process claims. The only element at issue in the enforcement action — whether the taxicab lacked a required inspection sticker — is immaterial to whether the PPA had a constitutional obligation to obtain a warrant to seize the taxicab. Conversely, if Plaintiffs had succeeded in having their citations dismissed on constitutional grounds, Defendants would not be barred from denying that civil rights violations occurred since the elements of a Section 1983 claim would not have been thereby established. Accordingly, we conclude that there is no identity in the "operative facts" undergirding the Plaintiffs' liability on the citations and their constitutional warrantless seizure claims sufficient to make those admissions preclusive to the constitutional claims.

### 2. Issue Preclusion

The doctrine of issue preclusion, also known as collateral estoppel, is based upon the principle that "'a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise.'" Dici v. Pennsylvania, 91 F.3d 542, 547 (3d Cir. 1996) (quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991)). Its application by federal courts is grounded in the federal full faith and credit statute, 28 U.S.C. § 1738, which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." Id., accord Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985). Thus, in determining whether the doctrine bars relitigation of an issue previously determined by a state court, a federal court must apply state law and evaluate whether relitigation would be precluded in the courts of the state in which the initial litigation took place. Swineford v. Snyder Cnty. Pa., 15 F.3d 1258, 1266 (3d Cir.

1994) ("Federal courts must give a state court judgment the same preclusive effect as would the courts of that state.") (citation omitted).[9]

Under Pennsylvania law, in order for issue preclusion to apply, five elements must be satisfied: (1) the issue is identical to one that was presented in a prior case; (2) there has been a final judgment on the merits of the issue in the prior case; (3) the party against whom the doctrine is asserted was a party in, or in privity with a party in, the prior action; (4) the party against whom the doctrine is asserted, or one in privity with the party, had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment. Dici, 91 F.3d at 548 (citation omitted); Cohen v. Workers' Comp. Appeal Bd., 909 A.2d 1261, 1264 (Pa. 2006) (citation omitted); Rue v. K-Mart Corp., 713 A.2d 82, 84 (Pa. 1998) (citation omitted).

We find that Defendants cannot demonstrate these elements as a matter of law. As we concluded with regard to claim preclusion, we conclude that Defendants have failed to establish the identity of issue, that the issue was essential to the judgment, and that there was a full and fair opportunity to litigate. Whether Plaintiffs lacked a PPA inspection sticker is not the same issue as whether the impoundment of the taxicabs was an unconstitutional seizure or a due process violation. Because the PPA did not have to affirmatively prove that the seizure was constitutional

---

[9] Under Pennsylvania law, issue preclusion is not limited to the findings of a prior judicial proceeding, and a court may apply issue preclusion to the findings made in a prior adjudicative administrative proceeding. See, e.g., Grant v. GAF Corp., 608 A.2d 1047, 1056 (Pa. Super. Ct. 1992), aff'd sub nom., Gasperin v. GAF Corp., 639 A.2d 1170 (Pa. 1994); Christopher v. Plymouth Twp., 635 A.2d 749, 752 n. 2 (Pa. Commw. Ct. 1993); Oxford Investments, L.P. v. Philadelphia, 21 F. Supp. 3d 442, 450-51 (E.D. Pa. 2014); see also Restatement of Judgments (Second) § 83 (1982) ("a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court").

at the administrative hearing, it was not "essential" to the judgment finding Plaintiffs liable to pay a fine, and Plaintiffs thus have not had a full and fair opportunity to litigate the issue.

**B.      The Constitutionality of The PPA's Warrantless Seizure of Taxicabs**

The parties' cross motions for summary judgment each argue that the record demonstrates as a matter of law that they are entitled to judgment on Plaintiffs' constitutional claims.  Plaintiffs argue that it is undisputed that their taxicabs were seized without warrants, no exception to the warrant requirement was present and, accordingly, the seizure was per se unreasonable. Defendants argue that there are exceptions to the warrant requirement that are applicable to its actions and that the provision of post-deprivation procedures was adequate.

**1.      The Warrant Requirement**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. The Pennsylvania Constitution contains a similar protection.  Pa. Const. Art. 1, § 8.  A "seizure" occurs "when there is some meaningful interference with an individual's possessory interests in that property."  Soldal v. Cook Cnty., Ill., 506 U.S. 56, 61 (1992) (citation and internal quotation marks omitted).  The essential purpose of the Fourth Amendment guarantee "is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'"  Delaware v. Prouse, 440 U.S. 648, 653-54 (1979) (footnote omitted) (quoting Marshall v. Barlow's Inc., 436 U.S. 307, 312 (1978)).  "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  Id. at 654 (citation omitted).

"'In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.'" Brown v. Muhlenberg Twp., 269 F.3d 205, 210 (3d Cir. 2001) (quoting United States v. Place, 462 U.S. 696, 701 (1983)); see also Katz v. United States, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment."); Pennsylvania v. McCree, 924 A.2d 621, 627 (Pa. 2007) (stating that a warrantless search or seizure "is presumptively unreasonable" under the Fourth Amendment and the Pennsylvania Constitution). However, this is not an absolute, and courts have recognized numerous exceptions to the warrant requirement. Whether a seizure violates the Fourth Amendment typically depends on an analysis that reflects a "careful balancing of governmental and private interests." Soldal, 506 U.S. at 71 (citation and internal quotation marks omitted).

It is undisputed that Defendants seized Plaintiffs' taxicabs without a warrant and with no pre-deprivation notice and hearing. Accordingly, we find that the summary judgment establishes a prima facie violation of the Fourth and Fourteenth Amendments and the parallel provisions of the Pennsylvania Constitution.

### 2. Exceptions to the Warrant Requirement

Defendants argue they are entitled to summary judgment on Count I because the record shows that the PPA constitutionally exercised its impoundment authority under the "community caretaking function" doctrine permitting governmental authorities to seize property without a warrant. They also argue that the "exigent circumstances" exception applies.

### a. The Community Caretaking Function Exception

The "community caretaking function," an exception to the Fourth Amendment warrant requirement first recognized by the Supreme Court in <u>Cady v. Dombrowski</u>, 413 U.S. 433, 441 (1973), allows law enforcement personnel "to seize or search a person or property 'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'" <u>Vargas v. Philadelphia</u>, 783 F.3d 962, 971 (3d Cir. 2015) (quoting <u>United States v. King</u>, 990 F.2d 1552, 1560 (10th Cir. 1993)). A community caretaking function seizure is permissible where its purpose is "'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" <u>Ray v. Twp. of Warren</u>, 626 F.3d 170, 175 (3d Cir. 2010) (quoting <u>Dombrowski</u>, 413 U.S. at 441); <u>see also Vargas</u>, 783 F.3d at 971 (to qualify for the community caretaking function warrant exception, the seizure must be for "a non-law enforcement purpose"). Examples of such a purpose include removing vehicles that are illegally parked or involved in traffic accidents to permit the uninterrupted flow of traffic. <u>Opperman</u>, 428 U.S. at 368 ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."). In applying the exception, courts focus "on the reasonableness of the vehicle impoundment for a community caretaking purpose." <u>United States v. Smith</u>, 522 F.3d 305, 314 (3d Cir. 2008) (considering factors such as whether the area in which the vehicle was located is one in which parked vehicles were subject to being damaged, vandalized, or stolen and whether an occupant owned the vehicle). In <u>United States v. Sanders</u>, 796 F.3d 1241 (10th Cir. 2015), the United States Court of Appeals for the Tenth Circuit listed the following "non-exclusive" factors as relevant to whether the community caretaking function should be applied:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to

impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment."

Id. at 1250.

Defendants argue that the summary judgment record demonstrates that each of the "impoundable offenses" set forth in the Current Impoundment Regulations – "particularly the regulatory definition rendering an operator 'unauthorized' and its vehicles subject to impoundment if providing taxicab service without proof of inspection as required by PPA – are logically related to protecting public safety."[10] (Def. Mem. at 37.) While they acknowledge that there are no reported decisions permitting the community caretaker function warrant exception to apply to the regulatory impoundment of taxicabs, (id. at 39), they argue that: (1) cases upholding the warrantless impoundment of even legally parked vehicles indicate that the exception should apply here; (2) because the commercial taxicab industry is extensively regulated, operators have a lower expectation of privacy, see New York v. Burger, 482 U.S. 691, 699 (1987) (holding that an owner or operator of a business has a reasonable expectation of privacy in commercial property, but it is "different from, and indeed less than, a similar expectation in an individual's home") (citation omitted); Shoemaker v. Handel, 795 F.2d 1136, 1142 (3d Cir. 1986) (stating that "[i]n closely regulated industries . . . an exception to the warrant requirement has been carved out for searches of premises pursuant to an administrative inspection scheme") (citations omitted); and (3) courts have recognized that governmental interests "outweigh private rights in the context of

---

[10] We note at the outset that the PPA has not accurately quoted the regulation. Section 1017.51, the definitional section of the Current Impoundment Regulation, states that an "impoundable offense" occurs when an "unauthorized taxicab provides, or attempts to provide, call or demand service in Philadelphia." 52 Pa. Code § 1017.51. An "unauthorized taxicab" is a "vehicle without a current and valid TLD inspection sticker affixed" or one that has been "placed out of service." Id. Section 1017.51 does not render an "operator" unauthorized, whether Defendants intend that term to refer either to the owner of the vehicle or its driver; the lack of an inspection sticker makes the vehicle unauthorized to provide the service.

the taxicab industry and other similar highly regulated industries particularly when, as here, a warrantless search or seizure is authorized by statute or regulation." (Def. Mem. at 40-41 (citing Buliga v. New York City Taxi Limousine Comm'n, Civ. A. No. 07-6507, 2007 WL 4547738, at *2 (S.D.N.Y. Dec. 21, 2007) aff'd, 324 F. App'x 82 (2d Cir. 2009) (rejecting challenge to governmental collection of trip information because "taxicab drivers 'have reason to expect intrusions' upon their privacy insofar as it pertains to their work. Adults who choose to participate in a heavily regulated industry, such as the taxicab industry, have a diminished expectation of privacy. . . .") (citations omitted); Dennis Melancon, Inc. v. New Orleans, 889 F. Supp. 2d 808, 829-30 (E.D. La. 2012) aff'd in part, vacated in part, and remanded, 703 F.3d 262 (5th Cir. 2012) (rejecting Fifth Amendment "takings" challenges to various New Orleans taxicab ordinances impacting the value of medallions and stating "New Orleans has a highly regulated taxicab industry. Plaintiffs, taxicab drivers and [] owners, do not have a legitimate expectation of privacy on the commercial premises of their vehicles."); see also Luzzi v. State Horse Racing Comm'n, 548 A.2d 659, 665 (Pa. Commw. Ct. 1988) (stating "[w]arrantless searches in closely regulated industries are permissible when such searches are authorized by statute or by a duly promulgated regulation").

Analogizing these decisions, Defendants assert five reasons why "the heavily regulated nature of the taxicab industry as a public utility directly ties into any straightforward consideration of the factors identified in [the Tenth Circuit's decision in Sanders]" and permit the warrantless impoundment of taxicabs upon the determination that a violation has occurred. (Def. Mem. at 41-42.) First, Defendants assert taxicab vehicles impounded by the PPA enforcement personnel are on public property, are engaged in the public utility of providing transportation for hire, and the riding public, who have no prior information regarding the condition of the vehicle, are relying on

regulation to ensure their safety. Second, owners are aware of the PPA's statutory and regulatory authority to impound for enumerated violations; thus, they assert Plaintiffs could not possibly claim surprise at the fact that a taxicab vehicle without a valid inspection sticker would be impounded.[11] Third, there is no alternative to impoundment in the case of an uninspected vehicle (unlike an impoundment necessitated by a driver violation, in which the Current Impoundment Regulations contemplate an owner may have an alternative driver take over the vehicle if able to make prompt arrangements). Fourth, while there is no assertion that any impounded vehicle was involved in a crime, each was by definition in violation of a regulation enacted to promote public safety. Fifth, by choosing to engage in a heavily regulated public utility, owners are aware of, and at least implicitly consent to, the fact that taxicab vehicles are subject to regulatory inspections without warrant, which may result in impoundments. Defendants argue that this consideration is particularly compelling here since the record shows that GCC opposed the Current Impoundment Regulations before they were adopted, yet continued to operate taxicab vehicles in Philadelphia without current inspection stickers even after the PPA conducted the first impoundment on August 1, 2014. (Def. Mem. at 42.)

Plaintiffs respond that the community caretaking function exception cannot apply to excuse the warrantless seizures because the impoundments were not for a "non-law enforcement" purpose. They assert that the PPA acts in a quasi-law enforcement capacity granted by the Pennsylvania Legislature when it employs the enforcement tool of impoundment in the event that taxicabs are observed operating in Philadelphia without a PPA inspection sticker. (Pls. Mem in Opp. to Def. Cross-Mot. ("Pls. Opp. Mem.") at 24-25.) They cite impoundment hearing

---

[11] Defendants also note there could be no surprise since Plaintiffs have vigorously opposed the Current Impoundment Regulations, which were approved by the IRRC over GCC's objections.

testimony from a PPA enforcement officer conceding that taxicab G91 was impounded as part of an "investigation" of the taxicab's lack of an inspection sticker in violation of the Regulations. (D.App. Tab 24, N.T. Aug. 7, 2014 at 5:14-7:2.[12]) They also contend that there was no legitimate public safety issue to justify the impoundment of Plaintiffs' taxicabs without a warrant since it is undisputed that they (1) are annually safety-inspected and certified by the PUC, (2) were not involved in accidents, (3) were not impeding the flow of traffic, and (4) were not illegally parked. Rather, Plaintiffs contend, their cabs, which are deemed completely safe to operate in outside of Philadelphia by virtue of their PUC inspection, were deemed unsafe and impounded solely because they were operating in Philadelphia without a PPA inspection sticker. They argue that this makes the seizures unreasonable since there could be "no legitimate threat to public safety" from a vehicle that had been safety inspected. (Pls. Opp. Mem. at 27.)

Additionally, Plaintiffs contend that Defendants have failed to meet their summary judgment burden on the community caretaking affirmative defense to show there was a non-law enforcement basis for the impoundments since the record establishes that (1) Defendants never required Plaintiffs to remedy the supposed threat to public safety, i.e., obtain a PPA inspection sticker, before releasing the taxicab from impound to be put back into service, and (2) the express purpose of the impoundment statute is to secure the owner's attendance at the enforcement hearing and its payment of all fines. (Pls. Opp. Mem. at 28 (citing 53 Pa. Cons. Stat. § 5714(g)(1) ("Upon satisfaction of all penalties imposed and all outstanding fines assessed against the owner or operator of the confiscated vehicle and payment of the costs of the authority

---

[12] The enforcement officer testified that, after stopping the taxicab on reasonable suspicion that it was operating in Philadelphia while uninspected because it lacked an inspection sticker on its hood, the cab was impounded because an on-site investigation revealed that the cab lacked an inspection sticker and the driver was not a PPA certified driver. (D.App. Tab 24, N.T. Aug. 7, 2014 at 7:14-22.)

associated with confiscation and impoundment, the vehicle, medallion and equipment shall be returned to its registered owner or registered lienholder."); Pl. Ex. A (PPA Final Rulemaking Order 126-3) (stating the purpose of posting collateral to retrieve an impounded vehicle is "to secure [the owner's] attendance at subsequent hearings"); and Pl. Ex. H (10/3/11 Email from Dennis Weldon to James Smith of the IRRC) ("The impoundment is viewed as a way of getting the operator of the illegal vehicle to appear at a hearing on the merits of the violation.")).)

Finally, applying the factors identified in <u>Sanders</u>, 796 F.3d at 1250, Plaintiffs argue that an "alternative to impoundment" was available in the form of designating the offending taxicab as "out of service," as was then permitted by 52 Pa. Code § 1003.32(a). That designation, they assert, would preclude the taxicab from operating in Philadelphia while not unconstitutionally depriving the owner of its property and the right to lawfully operate the taxicab outside of the city. They stress that, in applying the <u>Sanders</u> factors, it is undisputed that (1) the taxicabs are not implicated in a crime, and (2) the owners never consented to the impoundment.

With the exception of the seizures of G91 and R34 discussed below, we find as a matter of law that Defendants have not established that they are entitled to rely on the community caretaking function affirmative defense to excuse the warrant requirement for the seizures in this record. First, as Defendants concede, there is no case law recognizing that taxicab regulatory authorities can reasonably rely on the community caretaking function exception to engage in warrantless seizures merely because taxicab owners operate in a regulated industry. We hold that an entity's mere participation in the highly regulated taxicab industry cannot support Defendants' authority to engage in the warrantless seizures of taxicabs for a community caretaking purpose as a matter of law. The level of a property owner's expectation of privacy while engaging in a regulated activity is a separate question from whether there actually exists a community

caretaking purpose upon which the warrant requirement may be excused. Since the exception is based on law enforcement's duty to ensure the safety of the public, Defendants must show as a matter of law that its seizing taxicabs was reasonably related to such a duty. We conclude that, with the exception of G91 and R34, they have failed to do so on this record.

Moreover, while Defendants argue that operating an uninspected taxicab implicates the safety of the riding public, given the parties' stipulated facts no reasonable fact finder could conclude that the Plaintiffs' taxicabs were impounded because they were unsafe. Rather, they were impounded because they lacked PPA inspection stickers while allegedly engaged in hail service in the City or otherwise operating outside their permissible geographic areas. (See Stip. ¶¶ 45-46, 62-63, 68-69, 75-76, 81-82, 87-90.) Other than for G91 and R34, there is also no assertion that the seized taxicabs were implicated in a crime, located in a dangerous area, illegally parked, involved in a traffic accident or impeded traffic, or could not be driven out of the City (because of mechanical or safety issues or because it lacked a licensed driver). Rather, the record demonstrates that each was impounded to guarantee the appearance of its owner at an enforcement hearing and as surety that any assessment would be paid.

The Current Impoundment Statute authorizes the PPA to impound a vehicle "utilized to provide call or demand service in cities of the first class" that "are in violation of regulations of the authority." 53 Pa. Cons. Stat. § 5714(g)(1). But taxicabs "shall be returned" to their owners "[u]pon satisfaction of all penalties imposed and all outstanding fines assessed against the owner or operator of the confiscated vehicle." Id. Vehicles impounded under the Current Impoundment Statute and Current Impoundment Regulations are not subject to forfeiture.[13] (Stip. ¶¶ 27 & 36.)

---

[13] The fact that the taxicab is not deemed contraband property subject to forfeiture eliminates any assertion that a warrantless seizure may be permissible to ensure the owner does not abscond with the property to avoid it being forfeited, rather than as surety for payment.

Seizing a taxicab solely as surety for the payment of fines that possibly may be assessed for a violation of the Defendants' regulations does not create a safety-based purpose for the seizure. The purpose is to guarantee payment, and it is undisputed that Defendants used warrantless seizures for this purpose since Plaintiffs' taxicabs were released upon payment and with no requirement that they be safety inspected before being released and put back into service. For this reason, we find the seizures were not reasonably related to a community caretaking function.

The two exceptions noted above refers to the seizures of G91 and R34. The record establishes that the operators of these vehicle were deemed ineligible at the time of the seizure to drive them out of the PPA's jurisdiction. Because Plaintiffs do not assert that another driver was available, these vehicles were properly subject to a community caretaking function seizure since they lacked an eligible driver, even though it is undisputed that the citation issued to the operator of R34 for having a suspended license was later withdrawn. Thus, we conclude that the warrantless seizures of G91 and R34 did not violate Plaintiffs' constitutional rights. We therefore grant partial summary judgment to Defendants to the extent that GCC's claims are based on the seizure of G91 and Rosemont's claims are based on the seizure of R34.

### b. The Exigent Circumstances Exception

Another exception to the warrant requirement is "exigent circumstances." <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 474-475 (1971) ("It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show . . . the presence of 'exigent circumstances.'"). "We evaluate whether exigent circumstances existed by an objective standard; the subjective intent of the officer is irrelevant." <u>United States v. Mallory</u>, 765 F.3d 373, 383-84 (3d Cir. 2014) (citing

Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006)). "The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is 'heavy.'" Id. (quoting Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984)). Examples of exigent circumstances include situations of a "hot pursuit," the existence of imminent danger, and the threat of imminent destruction of evidence. Id. For the same reasons that Defendants cannot demonstrate a community caretaking function exception, we find that they also cannot meet their heavy burden to establish as an affirmative defense that the warrantless seizures were justified on exigent circumstances grounds due to a threat to public safety.

First, the record demonstrates that Plaintiffs' taxicabs were inspected and deemed safe to operate outside the City or within Plaintiffs' designated geographic areas in the City by the PUC. (See PSOF at ¶ 1 ("None of Plaintiffs' vehicles at issue in this Litigation were placed out of service by the [PUC] at the time of their impoundment by the PPA.") (citing Gabbay Decl. ¶ 8, Gabbay-Karsenty Decl. ¶ 8); see also id. ¶¶ 2-3 (asserting that impounded taxicabs had passed PUC safety inspections).[14]) Second, Defendants did not require Plaintiffs to submit to safety inspections before releasing the vehicles; they only required that Plaintiffs pay their fines. (See Stip. ¶¶ 66-67, 73-74, 85-86.) These two facts eliminate any reliance on exigent circumstances based on safety concerns. Third, the Current Impoundment Statute does not require the PPA to impound any vehicle and does not permit forfeiture. (Stip. ¶ 26.) Thus there can be no exigent circumstances based on the owner absconding with the property. Fourth, as noted by Plaintiffs, there is evidence that an alternative to impoundment existed at the time: designating the vehicle as "out of service" to permit the taxicab to taken out of the City or to its designated geographic area in the City, where it could legally continue to operate by virtue of its PUC-issued CPC. This

---

[14] Defendants have filed no response to the PSOF and have not otherwise denied the assertion that all of Plaintiffs' vehicles satisfied PUC safety inspections.

eliminates the possibility that exigent circumstances required impoundment to prevent the taxicab from continuing to troll for hail fares in prohibited areas. Finally, there is no evidence that any threat to public safety was "imminent" in a way that is analogous to other situations where the exigent circumstances exception has been accepted. Because the vehicle is returned to its owner whether or not it is "safe," we find that the exigent circumstances exception cannot apply as a matter of law. Accord Harrell v. City of New York, 138 F. Supp. 3d 479, 491-92 (S.D.N.Y 2015) (rejecting as a matter of law the application of an exigent circumstances affirmative defense to warrantless impoundment of taxicabs where the New York Taxi and Limousine Commission, like the PPA, had no authority to seek forfeiture of illegal taxicabs under the circumstances presented, the impoundment was for the express purpose of guaranteeing payment of fines, and upon payment the vehicle was returned without regard to its roadworthiness).

We find that the decision in Harrell is indistinguishable from the situation here. In Harrell, the owners of illegal taxicabs also alleged violations of the Fourth and Fourteenth Amendments arising from defendant's warrantless seizures of unlicensed vehicles to secure payment of fines where the agency had no statutory forfeiture authority. Id., 138 F. Supp. 3d at 488. The court determined on the summary judgment record before it that the defendant "summarily seizes private property, prior to any adjudication of liability, to ensure that those who are guilty will pay the fine that may later be imposed." Id. The court found that the "express purpose for the City's seizures . . . is not to relieve wrongdoers of the instrumentalities of wrongdoing (after all, the vehicles are returned as soon as an alleged wrongdoer posts a bond or pays a penalty)." Id. at 490 (parenthetical in original). The court also rejected the City's argument that summary deprivation of property was a "necessary tool" to enforce its taxicab

statute and safety rules since other tools — such as suspending drivers' licenses or imposing

substantial late fees for failure to appear and pay fines — were available, concluding that

> What [New York] cannot do, consistent with the Fourth Amendment, is summarily seize property to deter future violations from an alleged violator and hold the property as leverage to ensure payment of a penalty — if the violator is found guilty when the allegations against him are adjudicated.

Id. at 492 (footnote omitted). Like the court in Harrell, we conclude that warrantless seizures of

taxicabs violates the Fourth Amendment.

### 3. Adequacy of Post-deprivation Process

As we stated in an earlier Opinion in this case dismissing an unrelated due process claim,

"'[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful

time and in a meaningful manner.'" Germantown Cab Co. v. Philadelphia Parking Auth., Civ. A.

No. 14-4686, 2015 WL 1954163, at *7-8 (E.D. Pa. Apr. 30, 2015) (quoting Abdulai v. Ashcroft,

239 F.3d 542, 549 (3d Cir. 2001) (quotation omitted). "'In a typical situation, the hearing should

come before the Government deprives a person of his property.'" Id. (quoting Elsmere Park

Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008)). We recognized, however,

that "'due process, unlike some legal rules, is not a technical conception with a fixed content

unrelated to time, place and circumstances.'" Id. (quoting Biliski v. Red Clay Consol. Sch. Dist.

Bd. Of Educ., 574 F.3d 214, 220 (3d Cir. 2009) (citation omitted)).

While "[t]he Supreme Court 'consistently has held that some kind of hearing is required

at some time before a person is finally deprived of his property interests,'" Graham v. City of

Philadelphia, 402 F.3d 139, 145 (3d Cir. 2005) (quoting [Memphis Light, Gas and Water Div. v.]

Craft, 436 U.S. [1 (1978)] at 16), the Court "has rejected the proposition that [due process]

always requires the State to provide a hearing prior to the initial deprivation of property.'"

Biliski, 574 F.3d at 220 (alteration in original) (quoting Gilbert, 520 U.S. at 930); see also Nnebe

v. Daus, 644 F.3d 147, 158 (2d Cir. 2011) ("Due process does not, in all cases, require a hearing before the state interferes with a protected interest, so long as 'some form of hearing is [provided] before an individual is finally deprived of [the] property interest.'" (alterations in original) (quoting Brody v. Vill. of Port Chester, 434 F.3d 121, 134 (2d Cir. 2005))).  We stated in the earlier opinion that,

> To determine "when a hearing is required (i.e., pre- or post-deprivation) and what kind of procedure is due," Nnebe, 644 F.3d at 158 (citation omitted), we apply the three-prong balancing test announced by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 333 (1976).  See R. v. Dep't of Pub. Welfare, 535 Pa. 440, 636 A.2d 142, 153 (Pa. 1994) (adopting "the Matthews [sic] methodology to assess due process claims brought under Section 1 of Article I of the Pennsylvania Constitution").  This test requires consideration of three factors: (1) "'the private interest that will be affected by the official action,'" (2) "'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail,'" and (3) "'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'"  Biliski, 574 F.3d at 220 (quoting Mathews, 424 U.S. at 335); see also Nnebe, 644 F.3d at 158-59 (applying the Mathews balancing test to procedural due process claim involving suspension of taxicab licenses).

Germantown Cab Co., 2015 WL 1954163, at *7-8 (dismissing claim asserting due process violation arising from the PPA's order placing GCC's CPC out of service without a prior hearing for failing to file a renewal application).

If a pre-deprivation hearing is required, "no amount of postdeprivation process could cure the [] initial failure to provide a hearing."  Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008) (citing Zinermon v. Burch, 494 U.S. 113, 132 (1990)).  Whether a pre-deprivation hearing is necessary or, stated in the reverse, whether a post-deprivation hearing alone is sufficient to satisfy due process, depends on the circumstances.  Zinermon, 494 U.S. at 128 ("In some circumstances, however, the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process.")

(collecting cases). The circumstances identified by the Court in <u>Zinermon</u> where post-deprivation process is sufficient include (1) where the "'necessity of quick action by the State or the impracticality of providing any predeprivation process'" may mean that a postdeprivation remedy is constitutionally adequate, <u>id.</u> (quoting <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422, 436 (1982)); and (2) "where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures . . . are sufficiently reliable to minimize the risk of erroneous determination," <u>id.</u> (quoting <u>Memphis Light</u>, 436 U.S. at 19). The United States Court of Appeals for the Third Circuit has held that "'[i]t is beyond question 'that summary administrative action may be justified in emergency situations.'" <u>Elsmere Park Club, L.P.</u>, 542 F.3d at 417 (quoting <u>Hodel v. Va. Surface Mining & Reclamation Ass'n</u>, 452 U.S. 264, 300 (1981)).

In determining whether there was a necessity of quick action, the Third Circuit has held that courts should scrutinize officials' decisions very deferentially. <u>Elsmere Park Club, L.P.</u>, 542 F.3d at 418 (adopting the holding of <u>Catanzaro v. Weiden</u>, 188 F.3d 56, 62-63 (2d Cir. 1999) ("The law should not discourage officials from taking prompt action to insure the public safety."); and citing <u>Herwins v. City of Revere</u>, 163 F.3d 15, 19 (1st Cir. 1998); and <u>Harris v. Akron</u>, 20 F.3d 1396, 1404 (6th Cir. 1994)). In affording deference, however, the Third Circuit also cautioned against going too far:

> Yet, it is important to avoid the opposite trap. That is, we cannot apply so much deference as to allow "the government [to] avoid affording due process to citizens by arbitrarily invoking emergency procedures." [] Accordingly, we adopt the test laid out by our colleagues in the Second Circuit: "where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist . . . [,] the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion."

Id. at 418 (quoting Catanzaro, 188 F.3d at 63). Thus, we look to "whether there was 'competent evidence' supporting the reasonable belief that the [] situation presented an 'emergency,' and to whether the [governmental] actions were otherwise 'arbitrary' or an 'abuse of discretion.'" Id. (concluding that condemnation of apartments overrun with mold without pre-deprivation hearing did not deny property owner due process); see also Augustin v. Philadelphia, 171 F. Supp. 3d 404, 408 (E.D. Pa. 2016) (finding due process violation in defendant's procedures for attaching liens to real property for non-payment of gas bills without pre-deprivation notice and hearing and stating that "in those situations where a state must act quickly or where it would be impractical to provide pre-deprivation process, the Court has held that providing post-deprivation process may be enough to satisfy the requirements of the Due Process Clause. . . .  However, in situations where the State feasibly can provide a pre-deprivation hearing before taking property, it generally must do so regardless of the adequacy of a post-deprivation remedy to compensate for the taking.") (internal citations omitted).  Affording Defendants the deference due to take prompt action to insure public safety, we find that the lack of pre-deprivation notice and hearing in this case denied Plaintiffs due process as a matter of law and post-deprivation process is insufficient to cure the violation.

### a.      The Zinermon Factors

To determine whether pre- or post-deprivation notice and hearings are required, we examine (1) the necessity of quick governmental action and the (2) potential length or severity of the deprivation and likelihood of serious loss.  The summary judgment record fails to support a conclusion that pre-deprivation process was not possible.  Defendants maintain that a necessity for quick governmental action sufficient to justify warrantless impoundments existed because the lack of a PPA inspection created a safety risk.  It is undisputed that Plaintiffs' taxicabs are

inspected by the PUC and lawfully operate in all areas outside of the PPA's jurisdiction, as well as within the PPA's jurisdiction under defined circumstances. Thus, Defendants cannot show as a matter of law on this record that warrantless impoundments for lack of a PPA safety inspection are justified by any necessity for quick governmental action. For us to accept the necessity of quick action, we must accept that a taxicab can be "safe" one moment and "unsafe" moments later depending solely upon where in the Commonwealth it is operated. This is not a reasonable basis upon which to justify a warrantless emergency seizure. Defendants have also not shown that seizing the taxicabs as surety for the payment of fines requires quick governmental action.

While Defendants point to evidence that the potential length or severity of the deprivation and likelihood of serious loss is diminished by the requirement that a hearing be held within two days of an owner's request, they have failed to come forward with "competent evidence allowing the official to reasonably believe that an emergency does in fact exist . . . ." Elsmere Park Club, L.P. Plaintiffs, conversely, met their burden under Rule 56(e) to show that there is no "emergency" since their taxicabs can be legally operated outside of the PPA's jurisdiction. They have also shown that the majority of their operating territory is outside the jurisdiction of the PPA. Thus, unlike a taxicab with a PPA-issued medallion that may not be operated **anywhere** within the PPA's jurisdiction if it lacks an inspection sticker, Plaintiffs' taxicabs may still legally generate revenue even if not inspected by the PPA. Since the parties have also stipulated that vehicles impounded under the Current Impoundment Statute and Current Impoundment Regulations are not subject to forfeiture even if fines are not paid (see Stip. ¶¶ 27, 36), Plaintiffs have demonstrated as a matter of law that the impoundment of taxicabs creates an immediate deprivation. Because there is no basis for failing to provide pre-deprivation notice and hearing, the Zinermon factors support a conclusion that post-deprivation process is not adequate.

### b.  The <u>Mathews</u> Factors

The <u>Mathews</u> factors also support the conclusion that post-deprivation process is inadequate.  First, Plaintiffs have shown the majority of their taxicab service is provided outside of the PPA's jurisdiction, and it is not seriously disputed that their private interest in continuing to operate their taxicabs is affected by the PPA's warrantless seizures.  Second, the PPA's asserted governmental safety interest in keeping uninspected vehicles from operating is rejected for the reasons already discussed and the PPA fails to make any argument that providing pre-deprivation procedures would be overly burdensome.[15]  Finally, Plaintiffs have satisfied their burden on both prongs of the third <u>Mathews</u> factor.  They have shown (1) through the evidence of the impact on their non-PPA jurisdiction taxicab and paratransit services that there is a risk of an erroneous deprivation arising from the lack of pre-deprivation procedures; and (2) the probable value of substitute procedural safeguards, for example placing an out-of-service designation on an allegedly offending taxicab to permit it to be taken out of the PPA's jurisdiction.

---

[15]  Again, the decision in <u>Harrell</u> is indistinguishable.  Because the court concluded that the seizures were unconstitutional under the Fourth Amendment, it held that "it follows that the rule that postpones notice to the owner and an opportunity to be heard until after seizure also violates the Due Process Clause."  <u>Id.</u> 138 F. Supp. 3d at 493.  On the second <u>Mathews</u> factor, the <u>Harrell</u> court found that there was no legitimate governmental interest in seizing taxicabs "because its owner <i>might</i> have violated a local law."  <u>Id.</u> at 494 (emphasis in original).  The court concluded:

> In sum, the City has cited no case, and the Court has found none, in which a federal court has ever upheld the warrantless seizure of private property **in order to ensure payment of a fine**, prior to any adjudication that the property owner committed any offense or that a fine is due.  Whatever the due process clause may mean in more complicated scenarios, surely it means the government cannot summarily seize property because a fine might be imposed at some point in the future by a neutral judicial officer.

<u>Id.</u> at 494-95 (emphasis added).

In sum, we conclude that Plaintiffs were entitled to pre-deprivation process before the PPA could seize their taxicabs, and the lack of pre-deprivation process under these circumstances is unconstitutional.

## C.     The State Law Claims

Defendants Schmid and Marshall argue they are entitled to summary judgment on GCC's state law claims for conversion, trespass and fraud arising from Defendant Marshall's obtaining a GCC cab for two reasons:  (1) GCC voluntarily consented to leasing the cab to Marshall as part of its ordinary business activity and thereby consented to his use of the taxicab; and (2) GCC suffered no damages from Marshall's taking the cab to the PPA's inspection facility rather than using it to provide taxicab service since GCC received the daily lease rate it ordinarily charged for the use of the vehicle, and it was timely returned to GCC at the end of the day's lease period.  We grant Defendants' Motion on these claims.

### 1.     Conversion and Trespass to Chattels

Under Pennsylvania law, conversion is defined as "'the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification.'"  McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000) (quoting Underhill Coal Mining Co. v. Hixon, 652 A.2d 343, 345 (Pa. Super. Ct. 1994) and Stevenson v. Econ. Bank of Ambridge, 197 A.2d 721, 726 (Pa. 1964)). The exercise of control over the chattel must be intentional, but the tort of conversion does not rest on proof of specific intent to commit a wrong.  Id.  Conversion can be committed in several ways:  (1) acquiring possession of the chattel with the intent to assert a right to it that is adverse to the owner;  (2) transferring the chattel and thereby depriving the owner of control;  (3) unreasonably withholding possession of the chattel from one who has the right to it; or  (4)

misusing or seriously damaging the chattel in defiance of the owner's rights.  Prudential Ins. Co. of Am. v. Stella, 994 F. Supp. 318, 323 (E.D. Pa. 1998) (citing Fort Washington Res., Inc. v. Tannen, 846 F. Supp. 354, 361 (E.D. Pa. 1994)).  Where one lawfully comes into possession of the chattel, a conversion occurs if a demand for the chattel is made by the rightful owner and the other party refuses to deliver.  Id.  "[D]amages are not a required element of conversion and thus [a plaintiff] may obtain nominal damages if [] able to prove the elements but cannot present acceptable evidence for fixing compensatory damages."  Bamont v. Pennsylvania Soc'y for the Prevention of Cruelty to Animals, 163 F. Supp. 3d 138, 155 n.115 (E.D. Pa. 2016) (citing Stevenson, 197 A.2d at 727; Carter v. May Dep't Store Co., 853 A.2d 1037, 1041-42 (Pa. Super. Ct. 2004).

The elements of trespass to chattels "are essentially the same" as conversion.  QVC, Inc. v. Resultly, LLC, 159 F. Supp. 3d 576, 600 (E.D. Pa. 2016).  Trespass to chattels is governed by the Restatement (Second) of Torts § 217, which provides:  "A trespass to a chattel may be committed by intentionally:  (a) dispossessing another of the chattel, or (b) using or intermeddling[16] with a chattel in the possession of another."  Id. (citing Pestco, Inc. v. Associated Prods., Inc., 880 A.2d 700, 708 (Pa. Super. Ct. 2005)).  "The difference is that conversion entails a more serious deprivation of the owner's rights such that an award of the full value of the property is appropriate."  Id. (quoting Creative Dimensions in Mgmt., Inc. v. Thomas Grp., Inc.,

---

[16] "Intermeddling" means

intentionally bringing about a physical contact with the chattel. The actor may commit a trespass by an act which brings him into an intended physical contact with a chattel in the possession of another, as when he beats another's horse or dog, or by intentionally directing an object or missile against it, as when the actor throws a stone at another's automobile or intentionally drives his own car against it.

Restatement (Second) of Torts § 217, cmt e (1965).

Civ. A. No. 96-6318, 1999 WL 225887, at *3 (E.D. Pa. Apr. 16, 1999) (citing Restatement (Second) of Torts § 217 (trespass to chattels requires intentional dispossession or use or intermeddling with a chattel of another); § 222 (the actor is subject to liability for conversion where the dispossession "seriously interferes with the right of the other"))). "One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if, but only if, (a) he dispossesses the other of the chattel, or (b) the chattel is impaired as to its condition, quality, or value, or (c) the possessor is deprived of the use of the chattel for a substantial time, or (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest." Dickerson v. DeSimone, Inc., No. 1581 EDA 2015, 2016 WL 5921721, at *3 n.2 (Pa. Super. Ct. Sept. 7, 2016) (citing Restatement (Second) of Torts §§ 217, 218).

We find that the conversion and trespass claims fail as a matter of law. GCC suffered no actual conversion or trespass since it received its expected fee for the term that it leased the vehicle to Marshall, and Marshall timely returned the vehicle at the end of the lease term. GCC's argument that a conversion occurred relies on its assertion that it had a legal right to be present at an inspection of its taxicab and Defendants intentionally chose to ignore that right. (Pls. Mem. at 39 (citing 52 Pa. Code § 1017.41).) Since this cannot rise as a matter of law to a defendant's "asserting a right" to the taxicab "which is adverse to the owner," we conclude that this argument is meritless. The alleged violation of GCC's right to be present at an inspection does not establish a trespass or that its property was converted where it is undisputed that GCC received the expected lease payment and the chattel was timely returned. Plaintiff's only other argument on trespass is that Defendants interfered with GCC's possessory interest in the taxicab. Again, since

GCC obtained its expected lease payment and the property was timely returned, it did not as a matter of law suffer any interference with a possessory interest.

### 2.     Fraud

In order to establish a cause of action based on fraud under Pennsylvania law, a plaintiff must prove the following, by clear and convincing evidence:  (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994); Porreco v. Porreco, 811 A.2d 566, 570-571 (Pa. 2002) (citing Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999)).  Because of the heightened standard of proof for fraud claims, in order to avoid a summary judgment the party with the burden must present evidence of fraud from which a jury could, by clear and convincing evidence, find such fraud.  Anderson, 477 U.S. at 255; Constitution Bank v. DiMarco, 836 F. Supp. 304, 307 (E.D. Pa. 1993); see also Moffatt Enter., Inc. v. Borden Inc., 807 F.2d 1169, 1174 (3d Cir. 1986) (stating that, "[i]n responding to the defendant's motion for summary judgment, the plaintiffs met their burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud").

Defendants argue that GCC has failed to meet its summary judgment burden because, at most, it has only shown that Marshall failed to disclose that he was a TLD Enforcement Officer and has not shown that it relied to its detriment on that omission or suffered any injury because it received exactly what it expected, namely its full lease payment.  (Def. Mem. at 51.)  GCC responds that Marshall misrepresented his intent to become a taxicab driver with knowledge of that falsity to gain control of the vehicle.  It argues that it relied on that misrepresentation in

giving him the vehicle, which was returned to it with an "out-of-service" sticker based on the inspection done outside its presence.

We conclude that GCC has failed to meet its heightened summary judgment burden on the fraud claim. Although Marshall returned the taxicab to GCC with an out-of-service sticker, which he falsely told GCC resulted in his being stopped near 30th Street Station by the PPA for an inspection, it is undisputed that the PPA did not issue any citations to GCC relating to any aspect of Marshall's activities or the inspection of the taxicab. Because GCC received the full lease payment and was not cited for any deficiencies allegedly found during the inspection, it has failed to show by clear and convincing evidence that it suffered an injury that was proximately caused by its reliance on Marshall's misrepresentation that he intended to use the taxicab as a driver or that he was subject to an on-the-street inspection.

Accordingly, we conclude that Defendants are entitled to summary judgment on GCC's state law claims.

## V.    CONCLUSION

Defendants' Motion for Summary Judgment on Plaintiffs' state law claims for conversion, trespass and fraud is granted. Since Plaintiffs' claim for punitive damages is limited to those claims (see Compl. ¶¶ 241, 248, 257), summary judgment is entered in Defendants favor on punitive damages as well. Plaintiffs' Motion for Summary Judgment on liability on Count I, alleging a violation of their Fourth Amendment rights under 42 U.S.C. § 1983 and Article 1, Section 8 of the Pennsylvania Constitution is granted except as to GCC's claims based on the seizure of G91 and Rosemont's claims based on the seizure of R34. All other warrantless seizures of Plaintiffs' taxicabs were per se unreasonable with no applicable exception to the warrant requirement and were therefore unconstitutional. With the same two exceptions, we also

grant summary judgment against Defendants on liability on Count II, which alleges a violation of Plaintiffs' due process rights under the Fourteenth Amendment and Article 1, Section 1 of the Pennsylvania Constitution, since no post-deprivation process was sufficient to excuse the lack of a warrant.  Plaintiffs are also entitled to the declaratory and injunctive relief they seek in Count III, namely that the Current Impoundment Statute, 53 Pa. Cons. Stat. § 5714, and the Current Implementing Regulations, 52 Pa. Code §§ 1017.51 & 1017.52, are unconstitutional as applied. The damages resulting from Plaintiffs' successful claims will need to be tried to a jury.

An appropriate order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.